582 A.2d 1352

**COMMONWEALTH of Pennsylvania**

v.

**Dennis HUDGENS, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 17, 1990.

Filed Dec. 3, 1990.

James R. Protasio, Williamsport, for appellant.

Robert W. Ferrele, Asst. Dist. Atty., Williamsport, for Com., appellee.

Before OLSZEWSKI, KELLY and BROSKY, JJ.

BROSKY, Judge.

This is an appeal from the judgment of sentence entered following appellant's convictions for simple assault,[1] reckless endangerment,[2] terroristic threats,[3] and possession of an instrument of crime.[4]

Appellant presents the following issues for our review: (1) whether the evidence was insufficient to establish that the victim was in fear of imminent serious bodily injury; (2) whether the evidence was insufficient to establish that the victim was threatened; (3) whether the evidence was insufficient to support appellant's conviction for possession of an instrument of crime; (4) whether the verdict was against

1. 18 Pa.C.S.A. § 2701(a)(3).
2. 18 Pa.C.S.A. § 2705.
3. 18 Pa.C.S.A. § 2706.
4. 18 Pa.C.S.A. § 907(a).

the weight of the evidence; (5) whether the trial court erred in refusing to award appellant a new trial because of the Commonwealth's failure to furnish appellant with exculpatory evidence;[5] (6) whether trial counsel was ineffective in failing to call certain witnesses or appellant to testify on his behalf; (7) whether trial counsel was ineffective in failing to request that the case be continued; and (8) whether trial counsel was ineffective in failing to obtain a copy of the tape of the testimony presented at the preliminary hearing so that it could be used to impeach the Commonwealth's witnesses. For the reasons set forth below, we affirm the judgment of sentence.

Before addressing the merits of these issues, it is first necessary to recount the relevant facts of this case. On April 26, 1989, appellant, Dennis Hudgens, and some friends visited the Space Station Video Game Arcade located near the intersection of Campbell and West Edwin Streets in Williamsport, Pennsylvania. One of the members in Hudgens' group was Joey Lebert, who was approximately thirteen years of age at this time.[6] Lebert was dressed in a Ninja-type[7] of costume on this occasion. A group of teenagers, who were approximately fifteen to eighteen years of age, were also present in the arcade. Some of the

**5.** In his brief, appellant sets forth this issue in terms of whether the trial court erred in refusing to grant his request for a *mistrial* because of the Commonwealth's failure to disclose certain exculpatory evidence prior to trial. *See* Statement of Questions, Appellant's Brief, at p. 3. In view of the fact that appellant never requested that the trial court declare a mistrial, we believe that this question, as set forth in appellant's statement of questions, is incorrectly phrased. However, in the argument section of his brief, appellant discusses the question of whether the trial court erred in failing to grant him a *new* trial based on the Commonwealth's failure to disclose the exculpatory evidence. *See* Appellant's Brief, at pp. 11–12. In view of appellant's error, we have restated the issue, in the manner set forth above, so that it will conform to the discussion contained in appellant's brief.

**6.** Lebert testified that he and appellant enjoy a close, father-son type of relationship. *See* N.T., Volume II, at pp. 6–7.

**7.** *See* note 9, *infra,* for a description of a Ninja. In view of the fact that Ninjas were employed as spies and assassins, the Ninja costume was colored in black and was similar in style to a karate-type of outfit. However, the Ninja costume includes a black hood. *See* N.T., Volume I, at p. 37. *See also, You Only Live Twice* (MGM/United Artists 1967), a James Bond movie which featured Ninja assassins.

teenagers began to tease and harass Lebert with regard to his Ninja costume. As a result, Lebert left the arcade. The teenagers followed Lebert outside the arcade and continued their teasing. Lebert then observed the teens moving closer to him and he began to fear for his safety. In order to avoid a confrontation with the group, Lebert ran into a nearby alley.

Appellant subsequently became aware of the difficulties which Lebert encountered with the group of teens. Consequently, he exited the arcade and asked one member of the group, Clyde Swope, whether he was responsible for harassing or teasing Lebert. Swope denied making any comments to the boy. Hudgens disbelieved Swope and continued to exchange words with him. A heated argument ensued, during which Hudgens informed Swope that he was going to get him. In support of his threat, Hudgens then removed a sword which was concealed in his trousers. The sword resembled the type of weapon used by Samurai[8] or Ninja[9] warriors. Hudgens menaced Swope with the sword by holding it within five to six inches of Swope's body and by touching Swope's hand with the sword. Upon seeing the sword, Swope became frightened and attempted to back away from Hudgens. One of Swope's friends, Shalamar/Casper Brown, then entered the melee in order to protect Swope from possible harm. At this point, Brown

8. Samurai warriors were members of the military class in feudal Japan. *See* Webster's New World Dictionary 1187 (3rd College ed. 1988). Samurai warriors served as the retainers for the daimyos, or Japanese feudal lords. *See id.* These warriors traditionally wore two swords and lived by the Code of Bushido. *See id. See also,* Miyamoto Musashi, *The Book of Five Rings* (1988 ed.), which further describes the philosophy of the Samurai and the Code of Bushido.

9. Ninja is a term used to describe a member of a class of feudal Japanese warriors who were highly trained in the art of stealth. *See* Webster's New World Dictionary 917 (3rd College ed. 1988). Because of their specialized training, Ninjas were frequently employed as spies and assassins by the daimyos, who were the Japanese feudal lords. *See id.* We take judicial notice of the fact that examples of Ninja-type martial arts and clothing have been portrayed in films such as *You Only Live Twice* (MGM/United Artists 1967) (a James Bond movie), and more recently in *The Teenage Mutant Ninja Turtles* (Golden Harvest/New Line Cinema 1990) movie and television cartoon series.

and Hudgens argued, until Hudgens sheathed his sword and walked away, with another of his friends, Forrest Mull.

Delores Mayer, who happened to be driving by the arcade at the time of the incident, witnessed the altercation between Swope and Hudgens and notified the police. Following Mayer's call, the police arrived at the arcade and observed Hudgens and Mull walking away from the arcade. Upon seeing the police, Hudgens gave the sword to Mull and directed him to run away, while Hudgens ran in another direction. Although Hudgens managed to escape, Mull was apprehended by the police. Hudgens was later arrested, however.

Following a jury trial, appellant was convicted of the above charges on October 19, 1989. Post-trial motions were timely filed by trial counsel, and were denied by the trial court. Appellant was thereafter sentenced on February 5, 1990, at which time he was represented by new counsel. A timely motion to modify sentence was then presented to the trial court; this motion was also denied. This appeal followed.

The first three issues raised by appellant all involve questions pertaining to the sufficiency of the evidence. In reviewing claims of this type,

> we must view the evidence in the light most favorable to the Commonwealth as verdict winner, and drawing all proper inferences favorable to the Commonwealth, determine whether the jury could reasonably have found all of the elements of the crime to have been established beyond a reasonable doubt....

*Commonwealth v. Parker,* 387 Pa.Super. 415, 418–419, 564 A.2d 246, 248 (1989) (internal citations omitted). We shall address appellant's sufficiency questions with this standard in mind.

■ The first issue raised by appellant pertains to his conviction for simple assault. Under the Crimes Code, "a person is guilty of simple assault if he attempts by physical menace to put another in fear of imminent serious bodily

injury." [10] 18 Pa.C.S.A. § 2701(a)(3). Appellant contends that the Commonwealth failed to prove simple assault because the evidence was insufficient to establish that the victim was in fear of imminent serious bodily injury.

For support, appellant relies on testimony presented at trial which indicated that the victim wanted to continue the confrontation with appellant and that he was only prevented from doing so by his friend, Shalamar Brown. The specific testimony to which appellant refers was offered in support of his defense by his friend, Forrest Mull. Defense counsel asked Mull to describe the manner in which the victim, Clyde Swope, acted following the incident between Hudgens and Swope. Mull answered:

> Well, he was upset. He was like yelling at his friends, "I ain't afraid of Dan, let him back out", and he was just in a rage. He was, like, very upset because they was threatened.

N.T., Volume I, at p. 63. Defense counsel then asked Mull whether it would be accurate to say that Swope wanted to continue to fight with Hudgens, and Mull responded in the affirmative. *See id.*, at pp. 63–64.

We fail to discern how this testimony supports appellant's position. First, we note that the victim offered testimony which seems to contradict the version offered by Mull. Swope testified that after Shalamar Brown had intervened, appellant put his sword away and then pulled it out again before finally sheathing the sword and leaving the area. *See* N.T., Volume I, at p. 21. Thus, the facts adduced at trial could equally support an inference that appellant, rather than Swope, was the continued aggressor. However, even if we were to accept Mull's testimony, we are unable to comprehend how it rendered the evidence insufficient, since this portion of Mull's testimony only described

**10.** Serious bodily injury is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301. Further, bodily injury is described as an "[i]mpairment of physical condition or substantial pain." 18 Pa.C.S.A. § 2301.

Swope's conduct after he had been separated from Hudgens and after Hudgens had left the area. While Mull's observation indicated that Swope may have been full of youthful bravado *after* the threat posed by the sword had been removed, it does not indicate whether the victim was threatened by or was put in fear of imminent serious bodily injury while he faced an opponent armed with a Samurai sword. Accordingly, we find the victim's conduct after Hudgens left the area to be irrelevant to our determination as to whether the evidence was sufficient to sustain appellant's conviction for simple assault.

Appellant also suggests that the victim was not placed in fear of imminent serious bodily injury because Swope did not testify that appellant attempted to strike him with the sword or that appellant held the sword in a striking position. At trial, Swope testified that appellant threatened that he would get Swope. *See* N.T., Volume I, at pp. 14 and 22. Swope further indicated that appellant menaced him with the sword by holding it within five to six inches away from Swope's hand and by touching Swope's hand with the sword. *See* N.T., Volume I, at pp. 14 and 21–22. In addition, the victim testified that he was afraid that appellant would stick him with the sword. *See id.*, at p. 16. Forrest Mull corroborated this aspect of Swope's testimony and admitted that Swope seemed scared or frightened of appellant. *See id.*, at pp. 41 and 64. Swope's observation of the events was also supported by the testimony of Delores Mayer, who observed the fight as she was driving by the arcade. Mayer stated that she saw "a person with a sword or a saber aggressively approaching another man who was backing off and stepping off the curb". *See id.*, at p. 30. Mayer further testified that from her vantage point, appellant appeared to be more hostile and aggressive than the victim, who attempted to back away from the fight. *See id.*

Although appellant acknowledges this testimony, he cites *Commonwealth v. Fry*, 341 Pa.Super. 333, 491 A.2d 843 (1985) for the proposition that a mere touch is insufficient to

sustain a conviction for simple assault. *See* Appellant's Brief at p. 7. We find the type of conduct at issue in *Fry* to be significantly different from appellant's conduct in this case. In *Fry*, the defendant grabbed a ten year old girl by putting his arms around her and lifting her off of the ground. The child attempted to resist her attempted abduction by kicking and screaming. Fortunately for the child, her actions attracted the attention of safety patrol members who ran to assist her. Upon seeing the patrol members, Fry released the child. On appeal, this court found the evidence of simple assault under § 2701(a)(3) to be insufficient because the defendant did not threaten the child with physical harm, and did not strike the child or use any other physical means to subdue the child. *Fry*, 341 Pa.Super. at 336–338, 491 A.2d at 845.

Unlike the defendant in *Fry*, appellant verbally threatened that he would get the victim. *See* N.T., Volume I, at pp. 14 and 22. Further, appellant supported his ability to carry out the threat by wielding a sword in close proximity to the victim's body. *See id.*, at pp. 14 and 21–22. Also, several witnesses to the incident testified that the victim was visibly frightened by the appellant. Because this type of conduct was absent in *Fry*, we find it to be factually distinguishable from the situation presented in this case. Therefore, after careful review of the testimony presented at trial, we hold that there was ample evidence to sustain appellant's conviction for simple assault.

■ Appellant next challenges the sufficiency of the evidence with regard to his conviction for terroristic threats. In order to be found guilty of this offense, a person must "threaten to commit any crime of violence with [the] intent to terrorize another or ... in reckless disregard of the risk of causing such terror...." 18 Pa.C.S.A. § 2706. Thus, in order to prove a violation of this provision, the evidence must show: (1) that a threat to commit a crime of violence was made; and (2) that the threat was communicated with the intent to terrorize or with reckless disregard of the risk of causing such terror. *See Commonwealth v. Anneski,*

362 Pa.Super. 580, 583, 525 A.2d 373, 375 (1987), *allocatur denied,* 516 Pa. 621, 532 A.2d 19 (1987). Appellant contends that the evidence was insufficient to sustain his conviction for this offense because the victim was not threatened.

Appellant believes that the victim was not threatened because he merely told the victim that he would get him and did not indicate that he would kill the victim. In essence then, appellant argues that because he did not specifically inform the victim of the precise violent crime he intended to commit, the statement cannot be deemed to be a terroristic threat. Although appellant has not directed us to any authority in support of this novel proposition, we believe the following authorities to be instructive in resolving this issue.

In *Commonwealth v. White,* 232 Pa.Super. 176, 335 A.2d 436 (1975), the defendant informed his victim that he was "going to grab her" and proceeded to carry her into an abandoned building where he then pinned her against a wall and lifted her skirt. Before the defendant could proceed further, the victim called out to a neighbor for help. At that point, the defendant released the victim. On appeal, we affirmed the defendant's conviction for terroristic threats, despite the fact that the defendant never informed his victim of the nature of the crime which he threatened to commit. In reaching this result, we looked to the totality of the circumstances surrounding the utterance of the threat, and concluded that the defendant's conduct, in addition to his statement, constituted a threat to commit the crime of rape. *See White,* 232 Pa.Super. at 184, 335 A.2d at 439.

An analysis similar to the one adopted in *White* was followed in *Commonwealth v. Ferrer,* 283 Pa.Super. 21, 423 A.2d 423 (1980). In *Ferrer,* the defendant made a statement which was much like the one made by appellant in this case. Specifically, Ferrer informed a detective that the detective's actions were "going to cost him one of his kids" and that he was "going to get" either the detective or one of his children. Although Ferrer did not precisely explain to the detective which precise crime of violence he

intended to commit, we again looked to the nature of the threat as well as the surrounding circumstances, and found that the defendant threatened to commit murder or aggravated assault against the victim or his children. *See id.,* 283 Pa.Super. at 25, 423 A.2d at 425.

As made clear by this court in *White* and *Ferrer,* it is unnecessary for an individual to specifically articulate the crime of violence which he or she intends to commit where the type of crime may be inferred from the nature of the statement and the context and circumstances surrounding the utterance of the statement. In applying this test to the facts of this case, we find sufficient evidence of appellant's threat to the victim. Like the defendant in *Ferrer,* appellant informed his victim that he was going to get him. *See* N.T., Volume I, at pp. 14 and 22. Further, appellant unsheathed a sword and held it in close proximity to the victim's body. *See id.,* at pp. 14 and 21–22. Based on these facts, it can certainly be inferred that appellant threatened to stick the victim with the sword, and thereby cause death or serious bodily injury to the victim.[11]

■ Appellant next argues that the evidence was insufficient to sustain his conviction for terroristic threats because he lacked the ability to carry out his threat. Specifically, appellant alleges that he was unable to make good on the threat because the sword had a "flat" blade which was unable to cut the victim.[12] As recognized by this court, "[n]either the ability to carry out the threat nor a belief by the person threatened that it will be carried out is an essential element of the crime." *Anneski,* 362 Pa.Super. at

11. Death or serious bodily injury would fall within the definitions of the crimes of murder (18 Pa.C.S.A. § 2501) or aggravated assault (18 Pa.C.S.A. § 2702), both of which have been held to be crimes of violence. *See Ferrer,* 283 Pa.Super. at 24–25, 423 A.2d at 424–425.

12. Appellant's argument that the sword could not cause injury is contradicted by the record. Forrest Mull, who previously owned the sword, admitted that the sword was capable of causing injury if used with sufficient force. *See* N.T., Volume I, at p. 39. In addition, Mull stated that the sword could probably be used to smash an orange. *See id.* Therefore, we believe that the sword was capable of inflicting injury.

587, 525 A.2d at 376. Rather, the harm sought to be prevented by the statute is the psychological distress which follows from an invasion of another's sense of personal security. *Anneski*, 362 Pa.Super. at 583, 525 A.2d at 375; *see also* 18 Pa.C.S.A. § 2706, Official Comment. Because appellant's ability to carry out his threat does not render the evidence insufficient, we find appellant's argument to be without merit.

■ Appellant's final argument with respect to this issue is that his statement to the victim constituted a mere "spur-of-the-moment excited utterance" which resulted from anger. *See* Appellant's Brief at p. 8. As correctly recognized by appellant, § 2706 was not designed to penalize spur-of-the-moment threats which arise out of anger in the course of a dispute. *See* 18 Pa.C.S.A. § 2706, Official Comment; *see also Anneski*, 362 Pa.Super. at 585, 525 A.2d at 376, upon which appellant relies. We believe that the facts of this case are easily distinguishable from the scenario described in *Anneski*, however.

In *Anneski*, the victim threatened to run over the defendant's children with her automobile, if the children did not get out of her way. In response to the victim's threat, the defendant responded that if the victim attempted to harm her children, she would get a gun and use it. Under these facts, we held that the statement was a spur-of-the-moment type of threat which was made during a heated argument. In this case, however, the victim never threatened to do anything to or otherwise inflict harm on appellant. More importantly, appellant possessed a weapon at the time the threat was made. Thus, unlike the victim in *Anneski*, the victim in this case was subjected to the precise type of psychological harm and impairment of personal security which the statute seeks to prevent. In view of these circumstances, we decline to accept appellant's characterization of the statement as a mere spur-of-the-moment type of threat, and hold that the evidence presented at trial was sufficient to sustain appellant's conviction for terroristic threats.

█ In his third issue, appellant challenges the sufficiency of the Commonwealth's evidence with respect to his conviction for possessing an instrument of crime. A person is guilty of this offense if it is established that "he possesses any instrument of crime with [the] intent to employ it criminally." 18 Pa.C.S.A. § 907(a). This provision further defines an instrument of crime as: "(1) [a]nything specially made or specially adapted for criminal use; or (2) [a]nything commonly used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa.C.S.A. § 907(c). Appellant believes that the evidence was insufficient to support his conviction because the Commonwealth did not prove that the sword was a weapon commonly used for criminal purposes or that it was specially made or adapted for criminal use. For support, appellant relies on cases involving common items which are innocuous when used for their proper purpose. *See Commonwealth v. Myers*, 376 Pa.Super. 41, 545 A.2d 309 (1988), *allocatur denied*, 522 Pa. 588, 561 A.2d 741 (1989) (pair of scissors held not to be an instrument of crime); *Commonwealth v. Taylor*, 362 Pa.Super. 408, 524 A.2d 942 (1987), *allocatur denied*, 516 Pa. 640, 533 A.2d 712 (1987) (an ice pick and a pair of scissors held not to be instruments of crime); *Commonwealth v. Rodriquez*, 316 Pa.Super. 203, 462 A.2d 1310 (1983) (an ordinary razor blade held not to be an instrument of crime); and *Commonwealth v. Durrant*, 501 Pa. 147, 460 A.2d 732 (1983) (a pool cue held not to be an instrument of crime). We find these decisions to be inapposite, however.

Unlike the type of items described in the cases cited by appellant, swords and other related weapons were invented for the sole purpose of killing, maiming or inflicting injury upon another individual. Moreover, a sword is not the type of item which is routinely found in most households. Therefore, we find that the cases relied upon by appellant offer no guidance as to whether a sword can be considered to be an instrument of crime. Unfortunately, we have been unable to discover any caselaw which either includes or

excludes a sword as an instrument of crime. Nevertheless, we are constrained to disagree with appellant's assertions that a sword cannot be an instrument of crime.

As noted above, a sword is a type of instrument which was designed for the sole purpose of inflicting death or bodily injury. When a sword is used to menace the public during the commission of a crime, it becomes a tool that has been adapted for criminal use. Further, while we recognize that a sword may not be the type of item which criminals routinely utilize in today's modern society,[13] we believe that swords, like knives and other similar weapons are instruments that are commonly utilized for criminal purposes when they are possessed by an individual in a manner which is inappropriate under the circumstances. Certainly, the possession and display of Samurai swords in one's home or at a martial arts competition or exhibition would be an appropriate and lawful use of the instrument. However, the sword was not possessed or displayed in such fashion in this case. Instead, the sword was utilized by appellant in order to menace and terrorize members of the public. When a sword is possessed and utilized in the perpetration of a crime, we believe that it falls within the definition of an instrument of crime.

The fourth issue presented for review involves appellant's challenge to the weight of the evidence.[14]

13. Contrary to appellant's belief about the use of samurai swords, we take judicial notice of the fact that there is at least one instance where a sword of this type has been utilized for criminal purposes. During the past few months, an individual dressed in a Ninja-type costume has used a samurai sword to attack citizens in the Pittsburgh area. Whenever a sword is used in this manner, it cannot seriously be maintained that a sword is not an instrument of crime.

14. With respect to this matter, we recognize that there is some dispute as to whether issues raising weight of the evidence claims may be reviewed on appeal. *See e.g., Commonwealth v. Wallace,* 522 Pa. 297, 315, 561 A.2d 719, 728 (1989). However, this court has recently held that such claims may be reviewed in a limited context. *See Commonwealth v. McLean,* 396 Pa.Super. 23, 28 n. 4, 578 A.2d 4, 7 n. 4 (1990) (opinion by Olszewski, J.), and *Commonwealth v. Jenkins,* 396 Pa.Super. 395, 397–401, 578 A.2d 960, 961–963 (1990), (opinion by Olszewski, J.). In view of the reasoning set forth in *McLean* and *Jenkins,* we shall address appellant's weight of the evidence claim.

The determination whether to grant a new trial on the ground that the verdict is against the weight of the evidence rests within the discretion of the trial court, and we will not disturb that decision absent an abuse of discretion.... Before a trial court may award a new trial on this ground, it must appear that the verdict was so contrary to the evidence as to shock one's sense of justice and make the award of a new trial imperative....

*Commonwealth v. McLean, infra,* 396 Pa.Super. at 27–28, 578 A.2d at 6–7, quoting *Commonwealth v. Hunter,* 381 Pa.Super. 606, 617, 554 A.2d 550, 555 (1989) (internal citations omitted). We shall address appellant's claim in accordance with this standard.

■ Appellant believes that the verdict was against the weight of the evidence because he presented uncontroverted testimony that he was acting to protect Joey Lebert. In essence, appellant contends that the verdict was against the weight of the evidence because appellant was justified in his use of reasonable force to protect Lebert. We disagree.

■ In support of his argument, appellant first suggests that the verdict was against the weight of the evidence presented because the Commonwealth failed to present any evidence to rebut appellant's justification defense. *See* Appellant's Brief at p. 10. While the Commonwealth bears the burden of disproving a claim of justification beyond a reasonable doubt, a jury is not required to believe the testimony offered by a defendant in support of his claim. *See e.g., Commonwealth v. Carbone,* 524 Pa. 551, 560, 574 A.2d 584, 589 (1990). In this case, the Commonwealth chose to rely on Lebert's testimony in order to rebut the inferences of justification raised by appellant. In considering this testimony with regard to appellant's defense, the jury was free to accept or reject the interpretation suggested by appellant. The jury's rejection of appellant's interpretation of the testimony does not render the verdict contrary to the weight of the evidence, however. Therefore, we find this argument to lacking in merit.

The real question at issue here is whether the weight of the evidence supported appellant's defense of justification. In general, justification is available to a defendant where "the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged." 18 Pa.C.S.A. § 503(a)(1). However, a defendant may only use this defense where certain criteria have been met. Under the Code, the use of force is permitted to protect another person where:

(1) the actor would be justified under section 505 of this title (relating to use of force in self-protection) in using such force to protect himself against the injury he believes to be threatened to the person whom he seeks to protect;

(2) under the circumstances as the actor believes them to be, the person whom he seeks to protect would be justified in using such protective force; and

(3) the actor believes that his intervention is necessary for the protection of such other person.

18 Pa.C.S.A. § 506(a)(1)–(a)(3). Further, the use of force for self-protection is only justifiable where "the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S.A. § 505(a). In applying these provisions to the facts of this case, we conclude that appellant has failed to establish a defense of justification.

At trial, Joey Lebert testified that a group of teenagers "picked" on him by making funny noises, calling him names, and teasing him about his Ninja costume. *See* N.T., Volume II, at p. 4. However, Lebert could not identify the particular individual who was responsible for the harassment, and instead referred to the entire group. *See id.* Lebert then stated that he left the arcade because of the harassment, and when the group continued to approach him, he ran down the alley. *See id.*, at pp. 4–5. Lebert also testified that he was not present during the altercation between Swope and Hudgens. *See id.*, at p. 5.

In this case, the harm sought to be avoided by appellant was the prevention of any injury to Lebert. Although Lebert was subjected to verbal taunting, there was no evidence that any member of the group of teens, including Swope, directed any type of unlawful force against Lebert. Thus, if Lebert had acted in his own defense, he would not have been privileged to use reasonable force against Swope. Moreover, if such force had been used against him, Lebert was obliged to retreat to a place of safety, *see* 18 Pa.C.S.A. § 505(b)(2)(ii), and did in fact retreat in order to avoid any confrontation with his tormentors. In view of the fact that Lebert had left the area and was no longer in danger, we fail to discern how appellant's use of force was justified in this case. Accordingly, we conclude that the verdict was not against the weight of the evidence presented at trial.

The fifth issue raised by appellant is whether the trial court erred in refusing to award him a new trial because of the Commonwealth's failure to disclose evidence which he believed to be exculpatory. Specifically, appellant claims that a knife [15] which was allegedly in the Commonwealth's possession at the time of trial was exculpatory because it would have bolstered appellant's justification defense. Under Pa.R.Crim.P. 305 B(1), the Commonwealth is required to disclose to defense counsel all items which have been requested by a defendant, provided that they are material to the case. The items which must be disclosed include "[a]ny evidence favorable to the accused which is material either to guilt or to punishment, and which is within the possession or control of the attorney for the Commonwealth ... [and] any tangible objects ... or other tangible evidence." Pa.R.Crim.P. 305 B(1)(a) and (f). However, in order to be awarded a new trial, appellant must prove that the evidence was exculpatory and material to his case, and that the Commonwealth's failure to disclose the evidence was prejudicial. *See Commonwealth v. Woodell,* 344 Pa.Super. 487, 490, 496 A.2d 1210, 1212 (1985) and

---

15. This knife was found in the possession of Shalamar Brown after the incident between Hudgens and Swope.

*Commonwealth v. Murphy,* 493 Pa. 35, 45–46, 425 A.2d 352, 357 (1981). Appellant has failed to show that the evidence was material and exculpatory and that the Commonwealth's failure to disclose the evidence prejudiced his defense.

Exculpatory evidence has been defined as "evidence which extrinsically tends to establish [a] defendant's innocence of the crimes charged, as differentiated from that which, although favorable, is merely collateral or impeaching." *Commonwealth v. Redmond,* 395 Pa.Super. 286, 298, 577 A.2d 547, 552 (1990); *see also Woodell, supra.* Further, "[e]xculpatory evidence includes 'material that goes to the heart of the defendant's guilt or innocence....'" *Redmond, supra,* quoting *United States v. Starusko,* 729 F.2d 256, 260 (3d Cir.1984). "Evidence is material 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *Redmond,* 395 Pa.Super. at 298, 577 A.2d at 553, quoting *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40, 57 (1987).

As applied to this case, we are unable to discern how a knife found in Shalamar Brown's possession was exculpatory or material with regard to the incident involving the victim and appellant. At trial, Swope testified that he was unarmed. *See* N.T., Volume I, at p. 13. In addition, Delores Mayer corroborated Swope's testimony and verified that Swope appeared to be unarmed. *See id.,* at p. 30. Although appellant does not dispute this testimony, he refers us to the testimony of Forrest Mull who testified that another individual handed a knife to Brown, after Brown intervened in the fight. *See* N.T., Volume I, at p. 40. The record indicates that appellant was only charged with regard to the acts against Swope; he was never charged with any offenses relating to Brown. Thus, the fact that Brown possessed a knife following the incident between Swope and appellant does not tend to exculpate appellant of the of-

fenses pertaining to Swope. Moreover, Brown's possession of the knife did not appear to be material to appellant's defense. At trial, the jury was made aware of the fact that Brown possessed a knife during the incident. Nevertheless, the jury proceeded to reject appellant's defense theory and convicted him of the charges. Consequently, it is evident that even if the Commonwealth had disclosed the information to appellant, it is highly unlikely that the result would have been different.

Even if we were to assume that the knife was exculpatory and material to appellant's defense, we fail to see how appellant was prejudiced by the Commonwealth's failure to disclose the evidence. As stated above, appellant was never charged with any offenses relating to Brown. Further, the Commonwealth never attempted to utilize the existence of the knife in an unfair manner. *Cf. Commonwealth v. Thiel*, 323 Pa.Super. 92, 470 A.2d 145 (1983) (in which the Commonwealth failed to disclose tangible evidence to the defendant and then used the evidence to impeach the defendant's testimony.). In fact, the Commonwealth never made any references to the knife at trial. Rather, the sole reference to the knife arose during defense counsel's cross-examination of Forrest Mull, in which Mull stated that Brown was armed with some type of weapon. *See* N.T., Volume I, at p. 40. Because defense counsel apparently was aware of the fact that Brown was armed during the incident and brought this to the attention of the jury through Mull's testimony, we conclude that the Commonwealth's failure to disclose the knife was not prejudicial to appellant's defense. *See Murphy, supra; see also Commonwealth v. Fromal*, 392 Pa.Super. 100, 123, 572 A.2d 711, 723 (1990).

Appellant's remaining claims of error all relate to the effectiveness of trial counsel. Claims of ineffective assistance of counsel are subject to a three-part analysis:

First, it must be demonstrated that the underlying claim is of arguable merit. Next, it must be determined whether counsel's choice of action had some reasonable basis

designed to effectuate his client's interests. Finally, a showing must be made of how counsel's choice of action prejudiced the client.... The law presumes that counsel was effective, so that the burden of establishing ineffectiveness rests squarely upon the defendant.

*Commonwealth v. Nelson*, 389 Pa.Super. 417, 423, 567 A.2d 673, 676 (1989). We shall address appellant's claims of ineffectiveness with regard to this standard.

 Appellant first asserts that trial counsel was ineffective for failing to call two witnesses who would have supported his version of the incident. *See* Appellant's Brief, at p. 13. Unfortunately, appellant has neither identified these witnesses in his brief,[16] nor has he described the testimony which these witnesses would have provided; instead, appellant merely asserts that the witnesses would have corroborated his version of the incident. As stated by our Supreme Court,

[i]n making assertions of ineffectiveness, we also require that an offer of proof be made alleging sufficient facts upon which a reviewing court can conclude that trial counsel may have, in fact, been ineffective. This is so because we frown upon considering claims of ineffectiveness of counsel in a vacuum.

*Commonwealth v. Durst*, 522 Pa. 2, 5, 559 A.2d 504, 505 (1989). In view of appellant's failure to identify the witnesses and describe the substance of their testimony, we decline to find trial counsel ineffective for failing to call the witnesses.

 Appellant next contends that trial counsel was ineffective for failing to request a continuance so that the attendance of the witnesses at trial could be secured. This claim must likewise fail. First, we are unable to address this question because there is no indication that the witnesses could not have been obtained at the time of trial, thereby

16. We note that in his post-trial motions, appellant identified three witnesses who should have been called. These witnesses were: Shalamar Brown, Michelle Mosier and the owner of the Space Station Arcade. However, he did not describe the substance of their testimony in the post-trial motions.

rendering a continuance unnecessary. More importantly, we are unable to evaluate trial counsel's effectiveness with regard to this claim because of the deficiencies discussed above, to wit: appellant's failure to identify the witnesses and make an offer of proof with regard to the substance of the witnesses' proposed testimony. Accordingly, we find appellant's second claim of ineffectiveness to be without merit.

The final claim of ineffectiveness asserted by appellant relates to trial counsel's failure to obtain copies of the preliminary hearing tape, which would have been used to impeach the Commonwealth's witnesses. Although appellant claims that trial counsel could have confronted the witnesses with their inconsistent statements, he fails to offer any description as to the manner in which the testimony of the witnesses at the preliminary hearing was materially different or inconsistent with the testimony presented at trial. Under these circumstances, we decline to find trial counsel ineffective for failing to procure the preliminary hearing tape. *See Durst, supra.*

In sum, we hold that the evidence was sufficient to sustain appellant's convictions for simple assault, terroristic threats and possession of an instrument of crime. Further, we find that the verdict was not contrary to the weight of the evidence presented at trial. We also concluded that appellant was not entitled to receive a new trial due to the Commonwealth's failure to disclose exculpatory evidence. Finally, we determined that trial counsel was not ineffective. In view of the above discussion, none of the issues raised by appellant warrant the arrest of judgment or grant of a new trial trial. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.