J. S83008/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| MATTHEW FRANCIS SUNDO, | : | No. 2015 WDA 2015 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, November 20, 2015,
in the Court of Common Pleas of Allegheny County
Criminal Division at No. CP-02-CR-0005101-2015

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN AND STRASSBURGER,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED DECEMBER 22, 2016**

Matthew Francis Sundo appeals from the November 20, 2015 judgment of sentence entered in the Court of Common Pleas of Allegheny County after a jury convicted him of one count each of terroristic threats with intent to terrorize another, simple assault, and harassment.[1]  The trial court imposed an aggregate sentence of 4 to 8 months' incarceration, with credit for time served and immediate parole, followed by 18 months of probation.  We affirm.

The trial court set forth the following factual history:

> On March 18, 2015, Anthony DiGristina, while at work, received a phone call from his girlfriend, Lauren Foster, informing him that their neighbor,

---

* Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2706(a)(1), 2701(a)(3), and 2709(a)(1), respectively.

[appellant], had been continuously harassing her that afternoon. Mr. DiGristina and Ms. Foster live in Sharpsburg, a suburb of Pittsburgh, in a duplex in which [appellant] lives in the other unit. The units share a common interior wall, as well as basement space that is divided by a wall and a wooden door. The units also share a common porch that is approximately twelve (12) feet long. The porch contains a small brick wall divider that separates the units and is approximately three (3) feet high.

Ms. Foster was at home with her fifteen (15) month old baby and nine (9) year old child when [appellant] began "bothering" her on the afternoon of the incident. The bothersome and harassing behavior was a series of almost thirty (30) phone calls from [appellant] within a three (3) to four (4) hour timeframe. Ms. Foster attempted to ignore [appellant] and not respond to his calls, but then [appellant] began to bang loudly on her basement door. [Appellant] screamed at Ms. Foster to let him inside of her residence as he continued to pound on her basement door. When Ms. Foster did not open the basement door, [appellant] moved back upstairs and began banging on her dining room wall. At this point, Ms. Foster called [appellant] to address his behavior. [Appellant] told Ms. Foster to "shut the f'g baby up" or else he would come over and kill her and her daughter. [Appellant's] statement terrified Ms. Foster, prompting her to call her boyfriend, Mr. DiGristina, as well as her neighbor, Pete Rupert.

After speaking to his girlfriend, Mr. DiGristina left work early at approximately 3:00 p.m. that afternoon. When he arrived home, he found Ms. Foster to be "hysterical" and crying. After reviewing some of the messages that his girlfriend had received from [appellant] that day, Mr. DiGristina called [appellant] to address the situation, but the call quickly degenerated into an argument. During the phone call, [appellant] was swearing at and badmouthing Mr. DiGristina before he asked Mr. DiGristina to come outside on the porch. Mr. DiGristina complied with [appellant's]

request, exiting his home and going onto the front porch to speak with [appellant]. He did so because, at the time, he considered [appellant] to be a friend, and he believed that they could resolve the matter by having a conversation.

Very shortly after Mr. DiGristina stepped out onto his porch, [appellant] emerged from his residence, wearing a hospital gown and what appeared to be a police-style tactical bulletproof vest. [Appellant] was acting "belligerent" and "crazy," and he was in possession of a three (3) foot black baton-like stick that he was wielding over his head as if he was preparing to throw it or hit someone with it. [Appellant] was screaming and cursing at Mr. DiGristina, and he appeared to Mr. Di[G]ristina to be intoxicated. Armed with the vest and the large baton, [appellant] continued to move closer to Mr. DiGristina's location, standing only a foot away from him at one point.

After lodging a barrage of insults at Mr. DiGristina, [appellant] told Mr. DiGristina to go "F" himself and that he was going to kill him. [Appellant's] threat to kill Mr. DiGristina was made while [appellant] was holding the baton above his head and moving toward Mr. DiGristina. Mr. DiGristina felt scared, afraid, and intimidated after [appellant] threatened to kill him and as he saw [appellant] moving closer to him. Mr. DiGristina responded to [appellant's] threat by picking up a wicker chair from his side of the porch and throwing it at [appellant]. Ms. Foster and Mr. DiGristina both saw the chair hit [appellant] in the chest.

[Appellant] retreated back into his apartment after being struck by the chair. When he went inside the apartment, there was no blood on his face. However, when he reappeared in the doorway approximately one (1) minute later, he had blood on his face. At this time, a neighbor, Pete Rupert, approached the duplex, observing [appellant] standing in his doorway trying to "taunt" Mr. DiGristina into a fight. He also saw [appellant]

> holding what he believed was a knife. Officers arrived at the residence shortly thereafter, and [appellant] was taken into custody. Officer Brian Hoebel responded to the scene and observed that Ms. Foster was "highly upset," "agitated," and "crying" and that Mr. DiGristina was "very upset," "angry," and emotional about the incident.

Trial court opinion, 8/11/16 at 5-9 (citations to notes of testimony omitted).

The record reflects that appellant filed timely post-sentence motions that included a motion for judgment of acquittal and two motions to modify sentence. The trial court denied appellant's motion for judgment of acquittal and his first motion to modify sentence. The trial court, however, granted appellant's second motion to modify sentence and modified appellant's terms of parole to permit him to live with a relative, as opposed to being required to live in a halfway house. This timely appeal followed.

Appellant raises the following issue for our review:

> WAS THE EVIDENCE INSUFFICIENT AS A MATTER OF LAW TO CONVICT [APPELLANT] OF TERRORISTIC THREATS WHERE THE COMMONWEALTH'S EVIDENCE DEMONSTRATED ONLY THAT HE MADE MERE SPUR-OF-THE-MOMENT THREATS WHICH RESULTED FROM ANGER IN THE COURSE OF A DISPUTE, NOT THAT HE INTENDED TO TERRORIZE OR ACTED WITH RECKLESS DISREGARD FOR THE RISK OF CAUSING TERROR?

Appellant's brief at 5.

> In reviewing a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the

crimes charged was established beyond a reasonable doubt.

***Commonwealth v. Leatherby***, 116 A.3d 73, 79 (Pa.Super. 2015).

Here, a jury convicted appellant of committing terroristic threats under 18 Pa.C.S.A. § 2706(a)(1), which states that a person commits that crime "if the person communicates, either directly or indirectly, a threat to commit any crime of violence with intent to terrorize another[.]" The section mandates that the Commonwealth prove that "1) the defendant made a threat to commit a crime of violence, and 2) the threat was communicated with the intent to terrorize another or with reckless disregard for the risk of causing terror." ***Commonwealth v. Sinnott***, 976 A.2d 1184, 1188 (Pa.Super. 2009), ***rev'd on other grounds***, 30 A.3d 1105 (Pa. 2011). Additionally,

> [f]or a defendant to be convicted of terroristic threats, "the Commonwealth must prove that 1) the defendant made a threat to commit a crime of violence, and 2) the threat was communicated with the intent to terrorize another or with reckless disregard for the risk of causing terror." ***Commonwealth v. Tizer***, 454 Pa.Super. 1, 684 A.2d 597, 600 (1996). "Neither the ability to carry out the threat, nor a belief by the person threatened that the threat will be carried out, is an element of the offense." ***In re J.H.***, 2002 PA Super 108, 797 A.2d 260, 262 (Pa.Super. 2002). "Rather, the harm sought to be prevented by the statute is the psychological distress that follows from an invasion of another's sense of personal security." ***Tizer***, 684 A.2d at 600.

***Commonwealth v. Beasley***, 138 A.3d 39, 46 (Pa.Super. 2016).

With respect to Lauren Foster, the record reflects that on the morning of March 18, 2015, Ms. Foster was home with her 15-month-old daughter when appellant, who lived in the neighboring duplex, began to repeatedly call her, bang on her basement door while telling her to "let [him] in," and bang on her dining room walls. (Notes of testimony, 10/27-28/15 at 75-76). Ms. Foster estimated that appellant called her in excess of 30 times and banged on her basement door and dining room walls for three to four hours when she finally telephoned him and appellant told her to "shut the f'g baby up before he comes over and kills [Foster] and [her] baby." (*Id.* at 78, 81.) This evidence demonstrated that appellant threatened to commit murder and that the threat was communicated with the intent to terrorize Ms. Foster or with reckless disregard for the risk of causing her to suffer terror because he communicated his threat to kill during the three-to-four-hour period when he repeatedly telephoned her, banged on her basement door while directing her to let him in, and banged on her dining room walls. Therefore, viewing this evidence in the light most favorable to the Commonwealth and all reasonable inferences therefrom, it was sufficient to support the jury's factual determination that appellant committed the crime of terroristic threats against Ms. Foster.

With respect to Anthony DiGristina, appellant contends that:

> [a] careful review of the facts reveals [appellant's]
> emotions (and DiGristina's, for that matter) were
> running high, that both men were angry, and that
> the threat was one which was uttered spur-of-the-

> moment and out of anger in the course of a heated,
> seemingly hysterical, dispute among two neighbors,
> not one legitimately meant to terrorize DiGristina.

Appellant's brief at 17. The record, however, belies appellant's contention.

The record reflects that appellant wielded a baton that measured approximately 3 feet in length and 7 inches in width, while he came within 2 to 3 feet of Mr. DiGristina, and, in a "belligerent," "crazy" manner, threatened to kill Mr. DiGristina. (Notes of testimony, 10/27-28/15 at 82-86, 114-115.) This evidence demonstrated that appellant did not merely engage in a heated dispute with Mr. DiGristina. To the contrary, the evidence that appellant wielded a baton while he simultaneously threatened to kill Mr. DiGristina established that appellant had the present ability to complete his threats to kill Mr. DiGristina. Therefore, viewing this evidence in the light most favorable to the Commonwealth and all reasonable inferences therefrom, it was sufficient to support the jury's factual determination that appellant intended to terrorize Mr. DiGristina in violation of 18 Pa.C.S.A. § 2706(a)(i). ***See Commonwealth v. Hudgens***, 582 A.2d 1352, 1358 (Pa.Super. 1990) (holding evidence sufficient to support intent to terrorize when defendant threatened to "stick the victim with the sword" that defendant simultaneously held in his hand).

Judgment of sentence affirmed.

J. S83008/16

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/22/2016