J-S44033-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                     :         PENNSYLVANIA
                                     :
              v.                       :
                                     :
                                     :
RICHARD SALVADOR FALCONE : 
                                     :
            Appellant          :    No. 256 EDA 2024

Appeal from the Judgment of Sentence Entered December 19, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0005255-2022

BEFORE: NICHOLS, J., MURRAY, J., and LANE, J.

MEMORANDUM BY LANE, J.:              **FILED FEBRUARY 28, 2025**

Richard Salvador Falcone ("Falcone") appeals from the judgment of sentence imposed following his conviction for terroristic threats.[1] We affirm.

Between 2:00 and 2:30 a.m. on September 10, 2022, Samantha Bafile and her husband woke up twice to the sounds of gunfire and a man yelling and swearing in their neighborhood in Chadds Ford, Delaware County. Although the pair initially were not concerned about this gunfire, they phoned police due to concerns of the man's seemingly agitated and upset state.

Pennsylvania State Police ("PSP") Corporal Michael McGee ("Corporal McGee") and Trooper Christopher Gazale ("Trooper Gazale") responded to the scene. Although the officers did not hear any gunshots when they arrived, they observed an individual in the front driveway of 450 Webb Road, Chadds Ford. When Trooper Gazale attempted to make contact, the individual

_____

[1] *See* 18 Pa.C.S.A. § 2706(a)(1).

retreated inside the residence. Based on the registration of the vehicle in the driveway, the officers learned that it belonged to Falcone at that address.

PSP Corporal Tyler O'Shura ("Corporal O'Shura") arrived on scene and met with the two officers 100 to 125 yards "from the property." N.T. 12/19/23, at 42. Using his binoculars, Corporal O'Shura observed Falcone exit his residence "holding in the lower ready position what appeared to be an AR style rifle." *Id*. at 33. He watched Falcone walk around his driveway "in a somewhat erratic manner," search under a parked truck, and return into his residence. *Id*. at 35-36. Corporal O'Shura obtained Falcone's phone number, set up a perimeter, and called Falcone. The officer described his conversation with Falcone as follows:

> [Corporal O'Shura]: It was all over the place. I identified myself to [Falcone] as the [PSP]. I let him know that we were outside of his residence. We wished for him to exit the residence and walk out . . . with his arms up and unarmed.
>
> [Commonwealth]: What was his response to that?
>
> A. It was all over the place. He didn't believe me that I was the [PSP]. I believe we had two conversations. Because after I spoke to him the first time, he hung up on me. And then it was the second phone call that I continued to explain for him my wishes of [his] coming out of the residence [with] his hands up unarmed.
>
> And it was at this point then he told me that if anyone were to step foot on his property, that he would blow them away.
>
> * * * *
>
> Q. How did you feel about that statement when [it] was made to you?

- 2 -

A. It was then interpreted as a direct threat to me, being that, I already saw him exit his residence with a rifle. It was at this time . . . I requested activation of our special emergency response team.

*Id*. at 37-39. Falcone subsequently "hung up on" Corporal O'Shura. *Id*. at 39.

Corporal O'Shura continued to contact Falcone via text message, again identifying himself as PSP and requesting that Falcone exit the residence unarmed and with his hands up. Falcone responded that he did not believe the police were outside, and he refused to comply with Corporal O'Shura's instructions. Corporal O'Shura testified that Falcone was "agitated and upset" during the phone call and, based on Falcone's erratic behavior and "his thick and slurred speech," the officer believed Falcone "was more than likely under the influence of alcohol or a controlled substance." *Id*. at 41-42, 45. Police later recovered surveillance footage from the property, which showed that before they arrived, Falcone was "stumbling around outside his house [and] talking to people [who were not] there, [and was] in a weird state of mind." *Id*. at 95. The video additionally showed Falcone state, "private property," and fire his weapon seventeen times. *Id*. at 59, 78.

After an approximate six-hour standoff, Falcone surrendered peacefully to police. While in custody, Falcone asked Corporal O'Shura if he was the person he spoke to on the phone, and when Corporal O'Shura confirmed that he was, Falcone apologized to him. A search of Falcone's home produced thirty-six firearms.

The Commonwealth charged Falcone with terroristic threats and related offenses. The trial court conducted a non-jury trial on December 19, 2023. Falcone did not testify, but he presented six curated video clips from his property's surveillance system. The trial court found Falcone guilty of terroristic threats based on his telephone statement to Corporal O'Shura that "if anyone were to step foot on his property, . . . he would blow them away." N.T., 12/19/23, at 38.

The matter proceeded immediately to sentencing. The trial court imposed a sentence of five years' probation and required Falcone to relinquish his firearms. Falcone did not file a post-sentence motion, but filed a timely notice of appeal. Both he and the trial court complied with Pa.R.A.P. 1925.

Falcone raises the following issue for our review: "Whether the evidence was sufficient to sustain . . . Falcone's conviction for terroristic threats, where the evidence did not prove beyond a reasonable doubt that he intended to terrorize anyone." Falcone's Brief at 3.

Falcone argues the evidence was insufficient to support his conviction. Our standard of review of a sufficiency challenge is well-settled:

> The standard we apply . . . is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no

probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated, and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Edwards*, 229 A.3d 298, 305-06 (Pa. Super. 2020) (brackets and citations omitted).

"A person commits the crime of terroristic threats if [he] communicates, either directly or indirectly, a threat to . . . commit any crime of violence with intent to terrorize another[.]" 18 Pa.C.S.A. § 2706(a)(1). As our Court has further explained:

To convict a defendant of terroristic threats, the Commonwealth must prove that 1) the defendant made a threat to commit a crime of violence, and 2) the threat was communicated with the intent to terrorize another or with reckless disregard for the risk of causing terror. The Commonwealth does not have to prove that the defendant had the ability to carry out the threat or that the threatened individual believed the defendant would carry out the threat, as neither is an element of the offense. Rather, the statute seeks to prevent the psychological distress that follows from an invasion of another's sense of personal security.

The official comment to section 2706 explains: "The purpose of this section is to impose criminal liability on persons who make threats which seriously impair personal security or public convenience. It is not intended by this section to penalize mere spur-of-the-moment threats which result from anger." 18 Pa.C.S.[A.] § 2706 cmt.

However, this Court has held that just because a person is angry does not render them incapable of forming the intent to terrorize. Rather, this Court must consider the ***totality of the***

*circumstances* to determine whether the *threat was a result of a heated verbal exchange or confrontation*.

*Commonwealth v. Crosby*, 226 A.3d 104, 107 (Pa. Super. 2020) (some quotation marks, brackets, citations, and unnecessary capitalization omitted and emphasis in original).

At this juncture, we review both *Commonwealth v. Sullivan*, 409 A.2d 888 (Pa. Super. 1979), and *Commonwealth v. Kidd*, 442 A.2d 826 (Pa. Super. 1982), which Falcone relies on.

In *Sullivan*, the defendant called the PSP barracks and complained "that his father had earlier that day been assaulted by [the s]heriff of Adams County, and demanded that a state police officer be sent at once to his home." *Sullivan*, 409 A.2d at 888. PSP dispatched an officer to investigate. *See id*. However, before the officer arrived at the defendant's home, the defendant, who was admittedly upset and angry, called PSP once more and, "referring to [the sheriff], said, 'If you don't want to send anybody down here, I have a .30-30 rifle and I'll come up there and blow that son of a bitch's head off.'" *Id*. at 888-89. The following morning, the defendant encountered the sheriff on the street in "a meeting which neither had anticipated." *Id*. at 889. The pair engaged in a "loud shouting match," and the defendant again threatened to kill the sheriff. *Id*. For these threats, the defendant "was convicted of two counts of terroristic threats." *Id*. at 888.

On appeal, this Court determined there was no evidence to show the defendant had the intent to carry out either of his threats on the sheriff's life.

- 6 -

*See id*. at 889. Pertinently, this Court reasoned that when the defendant initially threatened the sheriff's life during his telephone call to PSP dispatch, he lacked the intent to terrorize the sheriff given his "agitated and angry state of mind." *Id*. Similarly, we reasoned the defendant's second threat on the sheriff's life, made in-person during the chance encounter, lacked intent as it was merely "the emotional product of a chance meeting with the [s]heriff the following morning which . . . both men described as a 'mouth battle.'" *Id*. Thus, this Court reversed both of the defendant's convictions for terroristic threats. *See id*. at 890.

In *Kidd*, police arrested the defendant for public drunkenness outside a tavern. *See Kidd*, 442 A.2d at 827. After exiting the police car at the county jail, the defendant fell and suffered a cut above his eye, causing the officers to transport him to the emergency room. *See id*. Before and while the defendant was in the emergency room, he was angry and "repeatedly shouted obscenities and generally screamed and shouted at the officers." *Id*. At one point, while the defendant's hands were handcuffed behind his back, he told police "he was going to kill them, machine gun them, if given a chance." *Id*. Based on this statement, a jury found the defendant guilty of terroristic threats. On appeal, however, this Court determined that this evidence was insufficient to convict the defendant of terroristic threats. *See id*. We reasoned that the circumstances suggested the defendant "was obviously inebriated and in an agitated and angry state of mind [such] that his conduct

expressed transitory anger rather than a settled purpose to carry out the threat or to terrorize the other person." ***Id***.

Falcone argues that the evidence was insufficient to convict him of terroristic threats, claiming the Commonwealth failed to prove the requisite *mens rea* required by section 2706(a)(1).  Although Falcone acknowledges he made a threatening statement to Corporal O'Shura, he contends that he lacked the requisite intent to issue a terroristic threat as he made the statement in the spur of the moment, while agitated and intoxicated, and without realizing he was speaking to a PSP officer.  In support, Falcone relies on this Court's analyses in ***Sullivan*** and ***Kidd***.  Just as those "defendants were angry about events that occurred minutes or hours earlier [when they made a threat in the spur of the moment], Falcone was upset about a phone call he received in a similar period."  Falcone's Brief at 13.  Thus, Falcone submits that because the legislature did not intend to impose criminal liability for spur-of-the-moment comments, the trial court erred by finding him guilty of terroristic threats.

The trial court determined that Falcone's sufficiency of evidence claim was without merit, reasoning as follows:

> This court finds . . . Falcone's statement was not a mere spur-of-the-moment threat caused by anger or agitation. Corporal McGee, Trooper Gazale, and Corporal O'Shura did not threaten [Falcone] with harm, or communicate in a manner which would cause [him] to become angry or agitated.  This court also finds there is sufficient circumstantial evidence to conclude that [Falcone] knew the [PSP] were outside his residence, and in an

attempt to intimidate [them], prior to his [threatening] statement, [Falcone] twice walked outside his residence armed with a rifle.

In summary, . . . Falcone communicated directly to Corporal O'Shura, "If anyone stepped onto his property, he would blow them away." Based on the nature of the statement, his intent was to communicate a threat to murder any [PSP officer] who entered upon his property. His intent is "inferred from the circumstances surrounding the utterance of the statement." Pa. SSJI 15.207(Crim). His apology to Corporal O'Shura is consciousness of his guilt.

Trial Court Opinion, 4/24/24, at 13-14 (unnecessary capitalization, some citations, and emphasis omitted).

In reaching this conclusion, the trial court found *Commonwealth v. Hudgens*, 582 A.2d 1352 (Pa. Super 1990), more persuasive than either *Sullivan* or *Kidd*. Accordingly, we review *Hudgens*.

In *Hudgens*, the defendant was at an arcade with a thirteen-year-old friend dressed in a ninja costume. *See Hudgens*, 582 A.2d at 1354-55. A group of fifteen to eighteen-year-olds teased and harassed the thirteen-year-old for his costume, causing him to leave the arcade. *See id*. at 1355. This group followed him and continued to harass him outside, and the thirteen-year-old ran into a nearby alley to avoid confrontation. *See id*. The defendant exited the arcade, confronted this group in defense of his friend, and accused one person ("the victim") of harassing the thirteen-year-old. *See id*. A "heated argument" ensued, during which the defendant informed the victim that "he was going to get him." *Id*. The defendant then removed a sword from his pants and "menaced" the victim "by holding it within five to six inches

- 9 -

of [the victim's] body and by touching [the victim's] hand with the sword." *Id*. As a result, the victim "became frightened and attempted to back away from" the defendant, and the victim's friend stepped in to protect him. *Id*. Although the defendant continued to argue with the victim's friend, he eventually sheathed his sword and walked away. *See id*.

Based on these events, a jury found the defendant guilty of, *inter alia*, terroristic threats. *See id*. On appeal, the defendant challenged the sufficiency of evidence supporting this conviction, asserting "that his statement to the victim constituted a mere 'spur-of-the-moment excited utterance' which resulted from anger." *Id*. at 1358. Our Court disagreed with this characterization, as: (1) "the victim never threatened to do anything to or otherwise inflict harm on" the defendant; and (2) "[m]ore importantly, [the defendant] possessed a weapon at the time the threat was made." *Id*. at 1359. Thus, we held the victim "was subjected to the precise type of psychological harm and impairment of personal security which the statute seeks to prevent [and] that the evidence presented at trial was sufficient to sustain [the defendant's] conviction for terroristic threats." *Id*.

After considering the relevant authority, and all of the evidence admitted at trial in the light most favorable to the Commonwealth as the verdict winner, we similarly determine the evidence was sufficient to support a finding that Falcone possessed the requisite intent to terrorize Corporal O'Shura when he

threatened to blow away anyone who stepped onto his property. *See Edwards*, 229 A.3d at 305-06; *see also Crosby*, 226 A.3d at 107.

Initially, we disagree with Falcone's argument that our Court's analyses in *Sullivan* and *Kidd* suggest that he threatened Corporal O'Shura in the spur of the moment, without an intent to terrorize him. In *Sullivan*, although this Court concluded the defendant made both of his threatening statements in the spur of the moment due to his angry and agitated state, we noted the Commonwealth presented no evidence showing he intended to follow through on them. *See Sullivan*, 409 A.2d at 889-90. Here, the Commonwealth did present such evidence: (1) before police arrived, Falcone shouted, "private property," and discharged a firearm seventeen times; (2). after police arrived, they observed Falcone patrol his property with an AR style rifle in the "lower ready position;" and (3) after Falcone threatened Corporal O'Shura, he engaged in a six-hour standoff with PSP. N.T., 12/19/23, at 33, 78.

Similarly, while we recognize that the defendant's intoxicated, angry, and agitated state in *Kidd* factored into this Court's determination that he threatened to shoot police in the spur of the moment without any accompanying intent, we emphasize it was not the only factor we considered — pertinently, the defendant threatened to shoot police while handcuffed and in their custody. *See Kidd*, 442 A.2d at 827. This does not comport with the facts in the instant case, as Falcone was not in police custody, and he had access to thirty-six firearms throughout his six-hour standoff with PSP.

Instead, we agree with the trial court's analysis that **Hudgens** is similar to the instant fact pattern. In **Hudgens**, this Court emphasized that the defendant did not make a spur-of-the-moment threat lacking requisite intent because: (1) "the victim never threatened to do anything to or otherwise inflict harm on" the defendant; and (2) "[m]ore importantly [the defendant] possessed a weapon at the time the threat was made." **Hudgens**, 582 A.2d at 1359. Here, when Corporal O'Shura called Falcone, he identified himself as PSP and requested that Falcone exit the residence with his hands up — as such, the officer did not threaten Falcone. Additionally, when Falcone threatened Corporal O'Shura, he had already fired seventeen gunshots, police witnessed him patrol his property with an AR style rifle "in the lower ready position," and he access to thirty-six firearms. N.T. 12/19/23, at 33. Accordingly, this record adequately supports the trial court's finding that Falcone possessed the requisite intent to terrorize Corporal O'Shura when he threatened him.

Although Falcone urges this Court to reweigh the Commonwealth's evidence to find that he made his threatening statement in the spur of the moment and without the intent required by the terroristic threats statute, we reiterate that we are not permitted to do so. **See Edwards**, 229 A.3d at 305. Thus, we hold the record evidence supports the trial court's finding Falcone guilty of terroristic threats beyond a reasonable doubt. **See** 18 Pa.C.S.A. § 2706(a)(1); **see also Edwards**, 229 A.3d at 305-06; **Crosby**, 226 A.3d at

107. As Falcone's sole issue on appeal is without merit, we affirm his judgment of sentence.

Judgment of sentence affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 2/28/2025