J-S24044-19

2019 PA Super 221

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                                   :                     PENNSYLVANIA
                                                   :
                                                   :
                   v.                            :
                                                   :
                                                   :
CHARLES  JACKSON                    :
                                                   :
                   Appellant                  :  No. 1598 EDA 2018

Appeal from the Judgment of Sentence May 18, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0006678-2017

BEFORE:   LAZARUS, J., McLAUGHLIN, J., and STEVENS*, P.J.E.

OPINION BY STEVENS, P.J.E.:                                **FILED JULY 19, 2019**

Appellant, Charles Jackson, appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County after the court, sitting as finder of fact in Appellant's non-jury trial, found him guilty of the single count of terroristic threats filed against him.  Sentenced to three years' probation, Appellant contends the trial court erred when it permitted the Commonwealth to amend the bill of information on the morning of trial to include additional victims whose involvement the criminal complaint had previously described, and he raises a challenge to the sufficiency of the evidence with respect to one alleged victim.  We affirm.

The trial court aptly sets forth the pertinent facts and procedural history of the case, as follows:

Around April 27, 2017, Tracy Spruell-McMoore, [a] co-worker of Appellant [at the Centers for Medicare and Medicaid Services, located in Philadelphia], began receiving numerous phone call

---

\* Former Justice specially assigned to the Superior Court.

hang-ups from a number without any caller identification. She later began receiving voicemail messages. At first, the voicemail messages contained music and then later the voicemails contained music and a person singing along to the music. Later, Ms. Spruell-McMoore began receiving voicemail messages where the speaker said, "Hey Marine." While she was receiving voicemail messages, she [could not] identify the speaker's identity because she worked from home and [had not] been at the office in some time. *Id*. at 15-17.

On May 1, 2017, around 9:49 PM, Ms. Spruell-McMoore answered the phone call from the unidentified caller. Appellant began casually speaking to Ms. Spruell-McMoore, to which she responded that she [did not] know who was on the other line. Appellant asked her to guess his identity, and she refused and stated that she would hang up unless he told her who was calling. Appellant finally identified himself as the unidentified caller to Ms. Spruell-McMoore and the two began conversing about how Appellant was doing while on administrative leave. N.T. at 18-20.

[Eventually], Appellant began ranting to Ms. Spruell-McMoore about their co-workers. Appellant told Ms. Spruell-McMoore that [T.R.], a co-worker that worked in a different department than Ms. Spruell-McMoore, was a "weak ass Marine." Ms. Spruell-McMoore was confused as to why Appellant was bringing up [T.R.], so she asked why he was speaking about him. Appellant just responded that "[T.R.] is just a weak ass Marine," Marines are "weak, not strong," and that [T.R.] was "fake and needed to blow his nose and wore panties." N.T. at 21-22.

Appellant then proceeded to complain about their manager. . . . Appellant stated that [Manager] was "in the closet" and that she kept bringing him into the office to complain that his work was not up to par. Appellant further ranted that [Manager] was a "bitch" and that her complaints about his work were "bullshit."

After he finished his tirade about [Manager], Appellant began commenting on another co-worker, [S.B.]. Appellant said, "I don't want to fuck [S.B.'s] wife, I want to fuck his mistress." Lastly, Appellant began ranting about their co-worker [D.D.]. Appellant told Spruell-McMoore that [D.D.] had pulled him into his office while licking his lips and running his fingers across his lips. Appellant said he [understood] the meaning of [D.D.'s] gestures

- 2 -

and that he wished he could "punch that faggot in the face." N.T. at 23.

At some point during Ms. Spruell-McMoore's conversation with Appellant, Appellant said, "They don't know who they're messing with; I'm going to show them." Ms. Spreull-McMoore asked Appellant what he was talking about, to which he responded, "I'm going to show them I'm not the one. I see the light and not no house light or ceiling light, I see the real light. Soon, they'll see the light."

Ms. Spruell-McMoore proceeded to ask Appellant again, what he was talking about. Appellant then started talking about how their co-workers "messed with the wrong [n-word]." Ms. Spreull-McMoore told Appellant not to say these things to her, to which he responded, "We cool; I'm not talking about you. I'm not threatening you." Ms. Spruell-McMoore responded that she [was not] concerned about her own well-being, she was concerned about their co-workers since she considered some of them her friends. N.T. at 23-24.

Later during their conversation, Appellant said that he would "pop a cap in their ass" and repeatedly said that he would "peel back their scalp" throughout the conversation with Ms. Spruell-McMoore. Ms. Spruell-McMoore took these threats very seriously and told Appellant that it is against the law for federal employees to threaten a fellow employee or anyone else. She was very upset by the phone call and prior to the call, she had considered Appellant a friend of hers. Ms. Spruell-McMoore tried to get more information about Appellant's plans regarding their co-workers, to which he replied, "Don't worry about it, you will read about it on the news. Don't worry about it, it don't have nothing to do with you, we cool. Those motherfuckers RO3s [Regional Officer 3s], but not you." N.T. at 24-25.

Ms. Spruell-McMoore became increasingly upset by this conversation and told Appellant he [could not] be saying he was going to hurt people at their job. She asked him why he wanted to hurt their co-workers, and he responded, "They messed with the wrong [n-word] and I want to show them. You'll read about it in the news and you'll see it on the news real soon. They're all working from home, but that won't last forever." Appellant almost constantly made these threats throughout their entire conversation, which lasted almost an hour. N.T. at 25-28.

After Ms. Spruell-McMoore's phone call with Appellant ended, she immediately called [Manager] and told her that she had received a phone call from Appellant and that Appellant had threatened [Manager] and their co-workers. Ms. Spruell-McMoore also warned [Manager] to be on the lookout since the threats had deeply disturbed her, along with the fact that he knew their co-workers were currently working from home. [Manager] advised Ms. Spruell-McMoore to contact Criminal Protective Service and call the local police and that [Manager] would report it to management and leadership in the office. N.T. at 30, 46.

At some point, [D.D.] and [S.B.] learned of the threats conveyed by Appellant directed towards them and [Manager]. Both [D.D.] and [S.B.] took the threats seriously and were upset and disconcerted by them. N.T. at 55-56, 65-66. [Both testified that they, too, had received numerous voicemail messages from an unidentified number consisting of no speaking, only music playing, and coughing, just as Spruell-McMoore had described. S.B. described how, in April, the caller spoke profanely to his wife and threatened S.B. that he was coming for him. Manager also received numerous phone calls and voice messages consisting of coughing and indistinct words. N.T. at 44-45.]

On May 1, 2017, around 11 PM, Detective Jared Fitzgerald, a criminal investigator for the Department of Homeland Security, received a phone call from the Philadelphia Dispatch Center. The Dispatch Center told him that Ms. Spruell-McMoore had called and relayed the threats Appellant had made over the phone regarding her co-workers. Detective Fitzgerald reached out to Ms. Spruell-McMoore and [Manager] the following morning and Ms. Spruell-McMoore provided him with Appellant's phone number . . . . Detective Fitzgerald called Appellant under the guise that he was with the wrongful termination board and set up a time to meet with him at a library. N.T. at 68-71.

Once Appellant arrived at the meeting place, Detective Fitzgerald told him he was from Homeland Security Federal Protection Service and began questioning Appellant about the phone calls. Appellant admitted he had spoken to Ms. Spruell-McMoore and that he had made the phone calls to his co-workers. Appellant claimed that [Manager] was out to get him, he admitted that he had left a voicemail message for [D.D.] calling him a "faggot," and that he had called [S.B.] and told him he "wasn't going to fuck his

- 4 -

mistress, he was going to fuck his wife." Appellant further indicated that Ms. Spruell-McMoore's recitation of their conversation was accurate. N.T. at 73-75.

. . .

On August 7, 2017, a preliminary hearing was conducted for Appellant. [The Bill of Information filed against him listed a single charge of terroristic threats under Pa.C.S. § 2706(a)(1) and a single complainant, Ms. Spruell-McMoore. The accompanying criminal complaint, however described all the above-listed employees and the phone calls they received]. At that time, Appellant was held on one charge of terroristic threats.

[On the morning when trial was to commence, the Commonwealth moved to amend the information to add the employees listed in the criminal complaint as additional complainants. The Commonwealth emphasized it was not adding charges. Pursuant to *Commonwealth v. Sinclair*, 897 A.2d 1218, 1221 (Pa. Super. 2006), *infra*, the court granted the motion over Appellant's objection, and trial commenced thereafter. N.T. at 10-12.]

Following a [non-jury] trial before [the trial court] on March 9, 2018, Appellant was convicted of terroristic threats with the intent to terrorize another, graded as a misdemeanor in the first degree.[] [On May 18, 2018, the trial court sentenced Appellant to three years' probation.]. Appellant filed [this] timely appeal . . . .

Trial Court Opinion, 11/2/18, at 3-6, 1-2, 7.

Appellant raises the following issues for our consideration:

1. Where Appellant was charged with a single count of terroristic threats, with the "victim" specified on the bill of information as Tracey Spruell-McMoore and the date of occurrence being on or about 5/1/17, did not the lower court err by permitting, at the start of the trial, the late amendment of the bill of information to specify additional complainants with additional and various dates of alleged offenses; and did not granting these amendments, particularly the addition of new complainants, violate the version of Pa.R.Crim.P. 564 which was then applicable, as well as, violate due process?

- 5 -

2. Although it appears that the lower court did not find the defendant guilty as applied to Tracey Spruell-McMoore, the complainant originally specified on the bill of information, to the extent that the lower court did convict the defendant of terroristic threats with respect to this complainant, was not the evidence insufficient as a matter of law?

Appellant's brief, at 4.

In Appellant's first issue, he contends that the court erred in permitting the Commonwealth to amend the bill of information on the day of trial. To the extent Appellant's issue asserts that the trial court, in granting the Commonwealth's motion to amend the bill of information, applied the wrong version of Rule 564 to his detriment, we find it waived for multiple reasons.

First, in response to the oral motion made on the morning of trial, Appellant offered only a general objection to adding new complainants to the bill of information. N.T., 3/9/18, at 10-11. He never posited that the court's ruling was subject to *former* Rule 564, which had been in effect at the time of the original bill of information, rather than current Rule 564 in effect on the date of the motion. Appellant now argues for the first time on appeal that principles of equity and due process implicated by the Commonwealth's day-of-trial motion required the court to apply the former version of the rule, but his failure to articulate this objection to the trial court compels us to find the issue waived. *See* Pa.R.A.P. 302(a) (party must make a timely and specific objection at trial in order to preserve an issue for appellate review); ***Commonwealth v. Smith***, --- A.3d ----, 2019 PA Super 194, *2 (filed June 20, 2019) (noting it is axiomatic that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal."). ***See also***

- 6 -

*Commonwealth v. Strunk*, 953 A.2d 577, 579 (Pa. Super. 2008) (observing even issues of constitutional dimension cannot be raised for the first time on appeal).

Alternatively, we may find waiver because Appellant's court-ordered "Supplemental Statement of Errors Complained of on Appeal," filed pursuant to Pa.R.A.P. 1925(b), fails to set forth clearly that he predicates his challenge on the position that former Rule 564 governs the issue. Specifically, Appellant's Rule 1925(b) statement states, in pertinent part:

> The defendant in this matter was charged with a single count of terroristic threats, with the "victim" specified on the bill of information as Tracey Spruel-McMoore and the date of occurrence being on or about 5/1/17. The court erred by permitting, on the day of trial, the late amendment of the bill of information to specify additional complainants with additional and various dates of alleged offenses; these amendments, particularly the addition of new complainants, violated the version of Pa.R.A.P. 564 then in effect.

Appellant's "Supplemental Statement of Errors Complained of on Appeal," filed 9/19/18, at 1.

Problematic for Appellant is that the phrase "then in effect" is part of the larger sentence stating, "these amendments . . . violated the version of Pa.R.A.P. 564 then in effect." The version then in effect at the time of the amendments was current Rule 564. Moreover, insofar as Appellant apparently intended the phrase to refer, instead, to the filing date of the original bill of information, that intention is not apparent from a plain reading of the statement as written. Indeed, the trial court reasonably understood

Appellant's statement to invoke current Rule 564, and it authored its responsive Rule 1925(a) opinion accordingly. **See** Trial Court Opinion, at 7. The court's interpretation is all the more understandable when one also considers that Appellant had never previously raised for the trial court's consideration whether former or current Rule 564 should apply to the motion to amend.

We observe that, generally,

issues not raised in a Rule 1925(b) statement will be deemed waived for review. An appellant's concise statement must properly specify the error to be addressed on appeal. In other words, the Rule 1925(b) statement must be "specific enough for the trial court to identify and address the issue [an appellant] wishe[s] to raise on appeal." **Commonwealth v. Reeves**, 907 A.2d 1, 2 (Pa.Super. 2006), *appeal denied*, 591 Pa. 712, 919 A.2d 956 (2007). "[A] [c]oncise [s]tatement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no [c]oncise [s]tatement at all." **Id**. The court's review and legal analysis can be fatally impaired when the court has to guess at the issues raised. Thus, if a concise statement is too vague, the court may find waiver.

**Commonwealth v. Hansley,** 24 A.3d 410, 415 (Pa.Super. 2011) (some internal citations omitted).

At best, Appellant's first statement of error suffers from an ambiguity and vagueness that left the trial court unable to identify a particular issue Appellant wished to raise and develop on appeal. We, therefore, may find waiver on this basis.

Finally, even if we were to conduct merits review of Appellant's issue, we would conclude he is entitled to no relief. As the Comment to newly

amended Rule 564 clarifies, **see** *infra*, the rule represents not a substantive departure from its previous iteration but, instead, a codification of the development of decisional law interpreting the rule since 1974. Because Appellant's argument fails to explain how the court's application of the amended rule, which merely conforms to longstanding precedent interpreting the former version of the rule, could have altered his rights, we deem his claim meritless.

To the extent Appellant's challenge implicates the newly amended version of Rule 564 in effect at the time of the motion, we observe the Rule provides:

> [t]he court may allow an information to be amended, provided that the information as amended does not charge offenses arising from a different set of events and that the amended charges are not so materially different from the original charge that the defendant would be unfairly prejudiced. Upon amendment, the court may grant such postponement of trial or other relief as is necessary in the interests of justice.
>
> *Comment:* The rule was amended in 2016 to more accurately reflect the interpretation of this rule that has developed since it first was adopted in 1974. **See Commonwealth v. Brown**, 727 A.2d 541 (Pa. 1999). **See also Commonwealth v. Beck**, 78 A.3d. 656 (Pa. Super 2013); **Commonwealth v. Page**, 965 A.2d 1212 (Pa. Super. 2009); **Commonwealth v. Sinclair**, 897 A.2d 1218 (Pa. Super. 2006).

Pa.R.Crim.P. 564, Comment.

Our jurisprudence has described both the purpose of Rule 564 and the standards by which we assess a challenge to an amended information:

> The purpose of this rule is to "ensure that a defendant is fully apprised of the charges, and to avoid prejudice by prohibiting the

last minute addition of alleged criminal acts of which the defendant is uninformed." [*Sinclair*, 897 A.2d at 1221]; ***Commonwealth v. Hoke***, 928 A.2d 300, 303 (Pa.Super. 2007). The test to be applied when evaluating a challenge to an amended information[, as] set forth in ***Commonwealth v. Bricker***, 882 A.2d 1008, 1019 (Pa.Super. 2005) (citation omitted)[, is]:

> Whether the crimes specified in the original indictment or information involve the same basic elements and evolved out of the same factual situation as the crimes specified in the amended indictment or information. If so, then the defendant is deemed to have been placed on notice regarding his alleged criminal conduct. If, however, the amended provision alleges a different set of events, or defenses to the amended crime are materially different from the elements or defenses to the crime originally charged, such that the defendant would be prejudiced by the change, then the amendment is not permitted.

[*Id.* (quoting ***Commonwealth v. Davalos***, 779 A.2d 1190, 1194 (Pa.Super. 2001) (citation omitted))]. Relief is warranted only when the amendment to the information prejudices a defendant. ***Commonwealth v. Roser***, 914 A.2d 447, 454 (Pa.Super. 2006), *appeal denied* 592 Pa. 788, 927 A.2d 624 (Pa.2007); *Sinclair*, 897 A.2d at 1223. Factors to be considered when determining whether Appellant was prejudiced by the Commonwealth's amendment include whether the amendment changes the factual scenario; whether new facts, previously unknown to appellant, were added; whether the description of the charges changed; whether the amendment necessitated a change in defense strategy; and whether the timing of the request for the amendment allowed for ample notice and preparation by appellant. *Roser*, 914 A.2d at 454; *Sinclair*, 897 A.2d at 1223.

*Page*, 965 A.2d at 1223–24.

In the instant matter, the amended information changed neither the charge, the relevant factual scenario, nor time of the alleged offense as set forth in the criminal complaint ten months earlier. Specifically, the criminal complaint described Ms. Spruell-McMoore as the complainant who received

- 10 -

Appellant's May 1, 2017, phone call in which he threatened certain named co-workers at the Centers for Medicare and Medicaid Services. The complaint developed the history leading up to this phone call by describing Appellant's actions over the preceding thirty days, during which he allegedly placed numerous harassing calls and voicemails to the home and cell phone numbers of these co-workers. So, too, did Appellant's preliminary hearing of August 7, 2017, through the testimony of Commonwealth witness Tracey Spruell-McMoore, extensively address allegations that Appellant made statements threatening to do harm to "three to five" named co-workers. N.T. 8/7/17, at 10-40.

The complaint and preliminary hearing thus put Appellant on notice that the Commonwealth would advance its terroristic threats case with evidence that he made indirect threats to harm certain co-workers during the latest in a series of phone calls revealing an animus toward the co-workers. Amending the information to add the co-workers as complainants and to include the earlier phone calls as evidence supporting the charge, therefore, did not introduce new charges or events that would necessitate a material change in defense strategy. Accordingly, we find no violation of Rule 564.

In Appellant's second issue, he contends the evidence was insufficient to convict him of terroristic threats, 18 Pa.C.S. § 2706(a)(1), with respect to complainant Tracey Spruell-McMoore.

When examining a challenge to the sufficiency of evidence, our standard of review is as follows:

- 11 -

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa.Super. 2011) (quoting

*Commonwealth v. Jones*, 874 A.2d 108, 120–21 (Pa.Super. 2005)).

The Pennsylvania Crimes Code defines terroristic threats as follows:

### § 2706. Terroristic threats

(a) **Offense defined.**—A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to:

   (1) commit any crime of violence with intent to terrorize another;

   (2) cause evacuation of a building, place of assembly or facility of public transportation; or

   (3) otherwise cause serious public inconvenience, or cause terror or serious public inconvenience with reckless disregard of the risk of causing such terror or inconvenience.

18 Pa.C.S. § 2706(a).

Based on this definition, this Court has made the following observations with regard to proving a charge of terroristic threats:

> "[T]he Commonwealth must prove that 1) the defendant made a threat to commit a crime of violence, and 2) the threat was communicated with the intent to terrorize another or with reckless disregard for the risk of causing terror." *Commonwealth v. Tizer*, 454 Pa.Super. 1, 684 A.2d 597, 600 (1996). The harm sought to be avoided is the psychological distress that follows an invasion of the victim's sense of personal security. *See id.* Consequently, "[n]either the [defendant's] ability to carry out the threat nor [the victim's belief] that it will be carried out is an essential element of the crime." *Id.; see also Commonwealth v. Hudgens*, 400 Pa.Super. 79, 582 A.2d 1352, 1358 (1990). Similarly, "[i]t is unnecessary for an individual to specifically articulate the crime of violence which he or she intends to commit where the type of crime may be inferred from the nature of the statement and the context and circumstances surrounding the utterance of the statement." *Id.* Thus, "[a] direct communication between the defendant and the victim is not required to establish the crime[.]" *In re L.A.*, 853 A.2d 388, 392 (Pa.Super. 2004).

*Commonwealth v. Sinnott*, 976 A.2d 1184, 1187–88 (Pa.Super. 2009), *aff'd in part, rev'd on other grounds*, 30 A.3d 1105 (Pa. 2011).

Here, the evidence viewed in a light most favorable to the Commonwealth as verdict winner allowed the finder of fact to make the reasonable inference that Appellant made his threats of violence with the intent to terrorize not only the employees he expressly targeted in his phone call with Spruell-McMoore, but also Ms. Spruell-McMoore, herself.

At trial, undisputed testimony revealed Appellant had made many "hang-up" phone calls and left harassing messages to Ms. Spruell-McMoore's voicemail, just as he had done with the other employees whom he

subsequently named as objects of his threats. In one such message to Spruell-McMoore, he mockingly said "Hey, Marine," and in their subsequent conversation, he initially refused her demand that he identify himself other than to say she knew him, she was his employer (which was technically inaccurate), and she was a Marine. N.T. at 18-19. Once he identified himself and they began to talk, he specifically insulted the Marines at length, calling them "weak, not strong," and cited a fellow employee's status as "just a weak-ass Marine" as the sole reason for targeting him. N.T. at 21-22. From the outset of their conversation, therefore, Appellant was implicitly hostile toward Ms. Spruell-McMoore.

Appellant also subjected Spruell-McMoore to profane comments on employees' private matters before transitioning, then, to voicing his intent to do them serious bodily harm. In this vein, he used extremely violent references to "peeling back their scalps," "popping a cap in their ass," and "Soon, they'll see the light," and "I want to show them. You'll read about it in the news. . . . They're all working from home, but that won't last forever." Notably, Ms. Spruell-McMoore also worked from home. N.T. at 25-26.

Afterwards, Appellant told Spruell-McMoore not to worry about her own personal safety, however, because "it don't have nothing to do with you, we cool. Those motherfuckers RO3 [Regional Officer 3s], but not you." N.T. at 24-25. Spruell-McMoore is a Regional Officer 3, and Appellant had referred to her earlier as his employer. N.T. at 26, 19.

Appellant contends that Ms. Spruell-McMoore's testimony that she did not feel personally threatened by his comments necessarily defeated the Commonwealth's case as it pertained to her as a victim.[1] As explained above, however, it is unnecessary to prove a victim believed the defendant would actually carry out threats to her personal detriment. Instead, the question is whether Appellant intended to terrorize Spruell-McMoore with his words and conduct.

Here, the totality of circumstances allowed for the reasonable inference that Appellant, in fact, did intend to terrorize Spruell-McMoore despite his overt reassurances otherwise. Indeed, such reassurances ring hollow when viewed against actions and statements strongly suggesting he held Spruell-McMoore in the same low regard he had for the other named employees. Indeed, Appellant systematically harassed Appellant anonymously for days just as he did the others, twice identified her as a Marine before revealing his intent to target an employee just for being a Marine, and vowed to do great physical harm to a group of Regional Officers working from their homes—a group to which Spruell-McMoore belonged. Appellant may not have expressly

---

[1] We note that Spruell-McMoore testified she was dismayed and upset over Appellant's phone call. Indeed, Spruell-McMoore took his threats seriously enough to text her manager immediately afterward and insist, despite the late hour and her manager's reply that she was sleeping, that they presently discuss a most urgent matter. N.T. at 29-30. She subsequently agreed to meet with investigators to report the matter officially.

threatened Spruell-McMoore, but his comments taken as a whole implicitly threatened her throughout the conversation.

We, therefore, reject Appellant's sufficiency challenge, as the evidence sufficed to prove beyond a reasonable doubt that Appellant intended to terrorize Spruell-McMoore along with other fellow employees.[2]

Judgment of sentence affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/19/19

---

[2] Appellant does not raise a challenge to the sufficiency of evidence offered to prove he delivered his indirect threats with the intent to terrorize the other employees. We note our concurrence with the trial court, however, that a reasonable finder of fact could infer from the evidence that Appellant must have known Ms. Spruell-McMoore would relate his threats to management and, ultimately, the employees at risk. Indeed, Ms. Spruell-McMoore maintained a professional and responsible disposition during Appellant's alarming words, and she cautioned him periodically that his threats and demeaning characterizations were both inappropriate and against workplace regulations.